## SUPREME COURT.

THE PEOPLE *ex rel.* THOMAS M'SPEDON & CHARLES W. BAKER agt. ANDREW V. STOUT, County Treasurer, &c.

THE SAME *ex rel.* CHARLES M'GILL agt. THE SAME.

Where *property* belongs to a *county*, it follows that the *necessary expenses* incurred in keeping it in repair, and preserving it in a condition for use, is a proper and legal *county charge*.

The *providing of rooms* suitable and sufficient for the transaction of the business of the *courts*, as provided by the Code, (§§ 28 & 51,) necessarily carries with it the *authority* to keep the rooms in suitable and convenient *order*— such as cleaning, painting, or other needful reparations—the *expenses* of which are a proper and legal *county charge*.

The board of supervisors of the city and county of New-York are restrained, by the 15th section of the act of April 12th, 1853, passed further to amend the charter of the city and county of New-York, from entering into any contract unless expressly authorized by statute; and such as are authorized, must be made in the manner provided by the 12th section of the act, in reference to work done for the corporation of the city.

That is, all work to be done and supplies to be furnished for the county, involving an expenditure of more than $250, shall be by contract, founded on sealed bids, or on proposals, made in compliance with public notice for the full period of ten days; and all such contracts, when given, shall be given to the lowest bidder, with adequate security.

Where work for over $250 is done for the county, not by contract, and not in the manner prescribed in the said 12th and 15th sections of said act, and where such amount is audited and allowed by the board of supervisors, the act of auditing and allowing such accounts is a *nullity*, and it is the duty of the county treasurer not to pay them.

Section 20, of the act of April 12, 1853, provided for a submission to the people of the city and county of New-York the question, whether the act should or should not become a law; which election took place on the 7th June, 1853.

On the 14th June, 1853, the legislature passed an act *supplementary* to an act

The People *ex rel.* M'Spedon & Baker agt. Stout, county treasurer.

entitled, "An Act further to amend the Charter of the City of New-York," passed April 12, 1853. The 4th section of this act declares that the same, and *the act to which it is supplementary,* (that is, the act of April 12, 1853,) "shall commence and take effect as laws immediately."

*Held,* that without this latter act of June 14, 1853, the act of April 12, 1853, so far, at least, as it seeks to make applicable to the board of supervisors sections 12 and 15 of that act, would be *unconstitutional* and *void.*

But that it was the intention of the legislature to re-enact and declare their will by § 4 of the act of June 14; that the act of April 12 should immediately become and take effect as a law; and the latter act must be regarded as in fact enacted by the law of June 14, 1853; thereby obviating the objections to the act of April 12th, in reference to its being dependent upon the will of the electors, whether or not it should become a law, and rendering it *constitutional* and *valid.*

*New-York Special Term, Dec.,* 1856.

An alternative mandamus has been issued in each of the above cases, and a motion is now made that a peremptory mandamus issue.

In the first case it is alleged that on the 25th of January, 1855, a resolution was adopted by the board of supervisors directing the books of record in the register's office to be repaired under the direction of the committee of the board on county officers. That the relators were employed to do the said work, and performed the same, and that their bill therefor was duly presented to the board of supervisors, and audited and allowed at the sum of $2,644.50. That the board of supervisors directed the defendant to pay the same.

In the second case, the relator alleges that he was employed by three of the supervisors, constituting the committee on civil courts of the board of supervisors, to paint the rooms occupied by the superior court.

That he so painted them, and presented his bill to the board of supervisors for said work, amounting to the sum of $300, and which said board have audited and allowed at that sum, and directed the defendant to pay the same.

JOHN W. EDMONDS, *for relators.*

M. V. B. WILCOXSON. *for counsel to the corporation, for defendant.*

The People *ex rel.* M'Spedon & Baker agt. Stout, county treasurer.

DAVIES, Justice. The register of the city and county of New-York is a county officer, (§§ 1 *and* 2 *of art.* 10, *Cons.* 1846; *art.* 8, *title* 2 *of chap.* 12, *part* 1 *of Rev. Stat.*)

It is made the duty of the register of the city and county of New-York to provide the necessary books for recording deeds and mortgages, and books for general indices. A like duty is imposed on the clerks of the several counties.

In the case of *Bright* agt. *The Supervisors of Chenango,* (18 *John. Rep.* 242,) this court held, that "the books directed to be procured became permanent records, and are the property of the county. Although not exclusively, they are chiefly for the benefit of the county. The clerk is bound to transmit them to his successor. The successor is not bound to pay the preceding clerk; and hence it follows, that if no compensation is to be made, it becomes a game of chance between the different incumbents. The one who comes in after books are provided, and retires before new ones are necessary, will find it an office of profit, while the predecessor, who purchased the books, and is shortly thereafter removed, may not have realized sufficient to equal his actual advancements. Such injustice has not received the sanction of law, but it is guarded against by requiring the supervisors to "allow all accounts chargeable against the county." The authority was general, and was intended to embrace any case where the service rendered was specially for the benefit of the county, and for which other provision had not been made. The present case is clearly one of that description, so far as it respects the books purchased. In conformity with this principle, the books in the register's office have been purchased and paid for by the county, and consequently are the property of the county.

It follows that the necessary expenses incurred in keeping the property of the county in repair, and to preserve it from decay, and keep it in a condition for use, is a proper and legal county charge. The audit and allowance by the board of supervisors, in cases where they are authorized to act, is final and conclusive as to the amount to be paid. (*People* agt. *Super-*

*visors of Queens county,* 1 *Hill,* 195; *Same* agt. *Lawrence,* 6 *id.* 244.)

By § 28 of the Code, it is made the duty of the supervisors of the several counties of this state to provide the courts appointed to be held therein with rooms, attendants, fuel, lights and stationery, suitable and sufficient for the transaction of their business. If the supervisors neglect, the court may order the sheriff to do so, and the expense incurred by him shall be a county charge. Section 51 of the Code makes this section applicable to the superior court, court of common pleas and marine court of this city.

If, therefore, the supervisors incur the expense in compliance with the requirements of the Code, such expense necessarily becomes a county charge. If it is incurred by the sheriff in pursuance of the order of the court, the law declares it shall be a county charge.

The providing of rooms suitable and sufficient for the transaction of the business of the court, necessarily carries with it the authority to keep the rooms in suitable and convenient order—such as cleaning, painting, or other needful reparations; and if the one is a proper and legal county charge it follows that the other would be also.

The amount, therefore, expended is a proper and legal county charge upon these grounds; and it having been audited and allowed by the board of supervisors, such audit is final and conclusive as to the amount, for the reasons above stated.

If there was no other obstacle in the way, I should grant the peremptory mandamus in each of the above cases, for the reasons stated in the opinion in the case of *The People ex rel. Downing* against this same defendant.

But the legislature have thought proper to place restraints upon the action of the board of supervisors of this county, which do not exist in reference to the supervisors of any other county of this state that I am aware of.

At the session of the legislature held on the 12th of April, 1853, an act was passed further to amend the charter of the city of New-York which made many radical changes in refer-

ence to the city government, to the management and disposi-
tion of its property, and the duties and liabilities of the officers
of the city government, the organization of the courts therein,
and the powers of the board of supervisors.

Section 12, of that proposed act, declared that all work to
be done, and supplies to be furnished, for the corporation in-
volving an expenditure of more than two hundred and fifty dol-
lars, shall be by contract, founded on sealed bids, or on propo-
sals, made in compliance with public notice for the full period
of ten days; and all such contracts, when given, shall be given
to the lowest bidder with adequate security.    All such bids or
proposals shall be opened by the heads of the departments ad-
vertising for them, in the presence of the comptroller, and such
of the parties making them, as may desire to be present.

Section 15, of the same proposed act, declares that "no con-
tract by the supervisors shall be valid unless expressly author-
ized by statute, and such as are authorized, must be made in the
manner provided by the 12th section of this act."

The contracts in each of the above cases, it is apparent, were
such as the supervisors were authorized to make; but it is fur-
ther declared that such contracts must be made in the manner
provided in the 12th section.

It is conceded that they were not so made.    That the ex-
penditure in each case was over the sum of $250; that no pub-
lic notice was given at all for bids or sealed proposals; that
none were received; that the work was not done by contract.
If this statute be the law of the state, it follows that the super-
visors could create no legal liability against the county by having
this work done in direct violation of the provisions of this act;
that no charge has been created against the county, and that this
court not only should not award a peremptory mandamus to the
county treasurer, commanding him to pay these accounts, but
that it would be its duty, on a proper application, to restrain
him from so doing.

Neither the corporation, nor the board of supervisors, can be
bound or charged with a contract made contrary to law.    The
cases on this subject are too numerous and familiar to need

citation. Neither can the corporation or the board of super-visors assume and pay a debt not a legal obligation upon them. (*Hodges* agt. *The City of Buffalo*, 2 *Denio*, 110; *Halstead* agt. *The Mayor of New-York*, 3 *Com.* 430.)

Neither will a mandamus be awarded to compel the county treasurer to pay an audit and an allowance of an account by the board of supervisors which was not a legal county charge. (*People* agt. *Lawrence*, 6 *Hill*, 244.) In this case, the supervisors of the county of New-York audited and allowed to the relator Justice Marritt, his account for expenses incurred by him in defending himself as one of the special justices in the city of New-York, on an impeachment and trial before the county court.

The county treasurer refused to pay the account thus audited and allowed, and an application was made to this court for a mandamus to compel him.

Bronson, Justice, in delivering the opinion of the court, says, " Whatever appearance of justice there may be in charging the expenses of the account upon the county, it is enough for us to say, that this consideration addresses itself exclusively to the legislature. If this had been a case where the supervisors had authority to allow the claim, I agree that it would have been the duty of the treasurer to pay it, without inquiring whether the account had been allowed upon insufficient evidence or at too large an amount. But as the supervisors had no jurisdic-tion over the subject matter, and that fact appeared upon the face of the account presented for payment, this act was a mere nullity, and it was the duty of the treasurer to withhold pay-ment."

So in the cases under consideration, it appears from the pa-pers that the work was not done in the manner prescribed in the 12th and 15th sections of the amended charter of 1853, and the act of the supervisors in auditing and allowing the ac-counts was a mere nullity, and it was the duty of the treasurer not to pay them. This is on the assumption that the act of 1853 is a valid and constitutional law. I am aware that the application of these principles seems harsh, but with the hard-

ship of the case I can have nothing to do.   The legislature have made the law, and with them rests the responsibility. My duty is to expound and execute it as I find it; and the results flowing from it, in cases like those now before me, may lead the legislature to a careful review of these provisions. These parties, mechanics, have rendered services and performed labor for the corporation and the county, and of which the public authorities have had the benefit, but through the oversight, or from other motives, the agents of these bodies have chosen to have this work done in a manner prohibited by law, and in a way which the law declares shall not be valid.   While I may regret that in these particular cases I am compelled to come to this result, my duty to maintain the law as I find it is too clear to shrink from it.

But is the law of 1853, amending the charter, valid and constitutional?   This question has been argued at great length, and with the ability and learning which might be expected from the distinguished counsel employed.

It is insisted, on the part of the relators, that this act is void, because it was not in fact a law enacted by the legislature,— that they delegated to the people of the city of New-York to say, whether or not it should be a law of this state, and that such delegation was unconstitutional, and that one portion of the people of the state cannot say what shall be a law for the whole state.

These suggestions are of force, and are not free from serious difficulty.   Section 20 of this act provided that the said act should be submitted for the approval of the electors of the city and county of New-York, at an election to be held in said city, on the 7th of June in that year; and if a majority of the tickets voted at such election contained an approval of said act, then the same should become a law.   If a majority of the tickets voted at said election contained a disapproval of the act, then the said act should be void.   Section 1 of article 3 of the constitution of this state declares that the legislative power of this state, shall be vested in a senate and assembly.

Section 14 of said article declares, that the enacting clause

The People *ex rel.* M'Spedon & Baker agt. Stout, county treasurer.

of all bills shall be, "The People of the State of New-York represented in Senate and Assembly, do enact as follows," and no law shall be enacted, except by bill.

Section 15 declares, that no bill shall be passed unless by the assent of a majority of the members elected to each branch of the legislature.

It is contended, on the part of the relators, that this submission of the question, whether the act should or should not become a law, is in conflict with the constitution, and that the act is unconstitutional and void. A similar provision was inserted in the act passed March 20, 1849, in reference to the free schools of this state.

The 14th section of that act declared, that in case a majority of all the votes cast at the election to be held to vote in relation to the act, should be cast against the law, then that act should be null and void; and in case a majority of all the votes should be cast for the law, then that act should become a law.

The effect of such provisions in the school law, and of a similar proceeding to the one now under consideration, was passed upon by the court of appeals of this state, in the case of *Barto* agt. *Himrod*, (4 *Seld.* 483;) RUGGLES, Ch. J., in delivering the opinion of the court, says, "It cannot be said that the propositions contained in that law, in relation to free schools, were enacted as law by the legislature. They were not law, or to become law, until they had received a majority of the votes of the people, at the general election, in their favor, nor unless they received such majority. It results, therefore, unavoidably, from the terms of the act itself, that it was the popular vote which made the law. The legislature proposed the plan or project, and submitted it to the people, to be passed or rejected. The legislature had no power to make such submission, nor had the people to bind each other by acting upon it. They voluntarily surrendered that power when they adopted the constitution."

WILLARD, Justice, says, "The law under consideration is in conflict with the constitution in various respects. Instead of

becoming a law by the action of the organs appointed by the constitution for that purpose, it claims to become a law by the vote of the electors. And it claims that the popular vote may make it void, and restore the former law. All the safeguards which the constitution has provided are broken down, and the members of the legislature are allowed to evade the responsibility which belongs to their office. *   *   * If this mode of legislation is permitted, and becomes general, it will soon bring to a close the whole system of representative government, which has been so justly our pride. The legislature will become an irresponsible cabal, too timid to assume the responsibility of lawgivers, and with just wisdom enough to devise subtile schemes of importance to mislead the people. All the checks against irresponsible legislation will be swept away, and the character of the constitution will be radically changed."

This decision is conclusive upon the question as to the unconstitutionality of this act, if it is not distinguishable from the one passed upon in that case.

The counsel for the defendant contends that that act was an act to amend and alter the charter of the city of New-York; it could not be constitutionally enacted without the assent of the electors of the city was obtained.

This very point was passed upon by ALLEN, Justice, in the case of *Clark* agt. *The City of Rochester*. (*Ante page* 204.)

In 1851, an act was passed by the legislature of this state to amend the charter of the city of Rochester. (*Laws of* 1851, *chap*. 389.) Sections 285 to 290, inclusive, provided for the subscription, by the common council of the city of Rochester, to the stock of the Rochester and Genesee Valley Railroad Company.

Section 291 provided for submitting to the electors of the city of Rochester, whether those sections should take effect as a law. Section 292 declared, that if two-thirds of the votes cast were in favor of said sections, then the same were to take effect immediately on filing a certificate of such election.

Judge ALLEN says, "The expediency of laws of this char-

acter is to be judged of only by the legislature, and they cannot shrink from the constitutional responsibility resting upon them. It is not the case conferring new powers or additional franchises upon a private corporation, which the corporation may elect to accept or not, as they may deem expedient."

So in the case now under consideration, the provisions of the act of 1853, now called in question, do not affect any of the franchises or property of the corporation, or confer any new powers or additional franchises upon it. They are but governmental regulations, affecting the powers of the supervisors, which it was competent for the legislature to make.

I must, therefore, hold, on the authority of these cases, that the act to amend the charter of 1853, so far, at least, as it seeks to make applicable to the board of supervisors, §§ 12 and 15 of that act, is unconstitutional and void, if no subsequent legislation has removed the difficulty. The decision of the court of appeals in *Barto* agt. *Himrod* was pronounced in June, 1853, at about the time the election was held in the city of New-York to vote upon this statute. This decision, as it is understood, was the main reason for the passage of the act of June 14, 1853, entitled, "An Act Supplementary to an Act entitled An Act further to amend the Charter of the City of New-York," passed April 12, 1853.

The fourth section of this act declares, that the same, and the act to which it is supplementary, (that is, the act of April 12, 1853,) "shall commence and take effect, as laws, immediately."

The counsel for the defendant contends that this was a re-passage of the act of April 12, 1853, and that thereby the legislature expressed its will that that act should immediately become a law.

In this position, I am inclined to think, he is correct. Regarding the cotemporaneous decision of the court of appeals, I cannot doubt that the legislature must have been aware that the act of April 12 was unconstitutional and void, and that they therefore and thereby re-enacted the same. It is to be observed

that the act of June 14, 1853, is not entitled an act to amend the act of April 12, but as supplementary to it.

The great object of the rules and maxims of the interpretation of statutes is, in all cases if possible, to discover the true intention of the law; for this purpose it is to ascertain what was the mind of the framers of a particular statute; and when that can be indubitably ascertained, the duty of the court is to give it effect, whatever may be their own opinion of its wisdom, expediency, or policy. (*Smith's Com.,* § 515.)

I can have no doubt that it was the intention of the legislature to re-enact and declare their will by § 4 of the act of June 14; that the act of April 12 should immediately become and take effect as a law, and that it is the duty of this court so to regard the language used. Considering the will of the legislature thus declared, we must regard the act of April 12 as in fact enacted by the law of June 14, and the objections to the former in reference to its being dependent upon the will of the electors, whether or not it should become a law, as obviated.

I have not overlooked the objection so forcibly urged by the learned counsel for the relators, that the act of June 14, 1853, was but an amendment of that of April 12, and that an amendment of a void law did not make it valid. The case of *Bradley* agt. *Baxter*, (15 *Barb.* 122,) is certainly an authority for this position; and if the act of June 14 simply was but an amendment of that of April 12, I should hold that it was no ratification of, or gave any vitality to that of April 12.

By a reference to the act amending the school law of March 20, 1849, passed Jan. 31, 1850, (*Laws of* 1850, *chap.* 7,) it will be seen that the latter act only amends the 8th section of the former, and declares that the act of January 31 " shall take effect immediately."

PRATT, Justice, in delivering the opinion of the court in the case last cited, says, " The legislature, in passing the act, (that of March 20, 1849,) with the provision to submit the question to a vote of the people, assumed that the legislature as well as the people were vested with a power which we hold they do not possess. In amending the act, we have the right to sup-

pose that they still labored under the same impression. They therefore *only* intended to amend what they supposed to be a valid law of the land, and not to take the responsibility of re-enacting the law itself. An amendment made under such circumstances cannot have the effect to make a void law valid."

It seems to me, that in this case the legislature did intend to take the responsibility of re-enacting the law itself, and that the language used is more broad and significant than the usual declaration, "that this act shall take effect immediately."

I am therefore of the opinion, that the provisions of the statute, in reference to the duty of the supervisors, to have work done for them done by contract, are valid, and have been legally enacted, and that consequently the relators have no legal claim against the county for the work thus done contrary to the provisions of law, and the motion for a peremptory mandamus in each case must be denied.

