(40 App. Div. 593.)

## BOYCE v. TOWN OF SHAWANGUNK.

(Supreme Court, Appellate Division, Third Department. May 3, 1899.)

1. BRIDGES—DEFECTS—NEGLIGENCE—SUFFICIENCY OF EVIDENCE.

In an action for injury from a defective abutment in a bridge, the highway commissioner and another testified that, shortly before the accident, they examined the abutment, but not very closely, merely passing within a few feet thereof, and that they concluded it was safe. The commissioner admitted that probably a closer inspection would have been better. One witness testified that, six months prior to the accident, the abutment appeared to be unsafe; and several others testified that it was built with small stones, like an ordinary dry stone wall, with sticks to keep the stones in place, and that the sticks had become rotten. The bridge was many years old. Held, that a finding was justified that the abutment was unsafe for some time prior to the accident, and that the commissioner was negligent in failing to discover the defect.

2. SAME—NEGLIGENCE OF TRAVELER.

One who has given notice to the proper authorities of a defect in a bridge is not negligent in thereafter using it, where it is left open for travel.

3. SAME—SUFFICIENCY OF EVIDENCE.

In an action for injuries resulting from the giving way of the abutment of a bridge, several witnesses testified that, for some time prior to the accident, plaintiff had complained of the defect; the town supervisor testifying that plaintiff stated he was afraid the abutment would fall. Plaintiff admitted he had spoken of the defective condition, but denied that he stated it was liable to fall, and that, as the authorities had been at work there and had examined the bridge, he supposed it was all right, and that he had never supposed it was dangerous. Held, that a finding that plaintiff did not know of the dangerous defect at the time of the accident was not against the preponderance of the evidence.

4. SAME.

One driving oxen across a bridge, without knowledge of a dangerous defect therein, cannot be deemed negligent in remaining on the seat, where the evidence merely shows that one driving in a dangerous place should walk by the side of the oxen.

5. SAME—WANT OF FUNDS TO REPAIR BRIDGE—BURDEN OF PROOF.

To entitle one to recover for injuries from a defect in a bridge, he need not show the possession of funds by the highway commissioner with which to repair the bridge before the accident; that being matter of defense.

6. CONTRIBUTORY NEGLIGENCE—PERILOUS POSITION.
    Where a bridge across which one is driving suddenly begins to give
    way, the driver is not precluded from recovering because he failed to
    alight from the wagon.

Appeal from trial term.

Action by George Boyce against the town of Shawangunk. From a judgment for plaintiff, and an order denying a new trial, defendant appeals. Affirmed.

Argued before PARKER, P. J., and LANDON, HERRICK, PUTNAM, and MERWIN, JJ.

D. M. De Witt, for appellant.
John C. R. Taylor, for respondent.

PUTNAM, J. On the morning of the 9th of April, 1898, the plaintiff, while proceeding with a load of hay, drawn by a pair of oxen, along a highway in the town of Shawangunk, Ulster county, N. Y., came to a bridge on said highway. He had made a seat of two boards, in front of and projecting from the wagon about two feet, at the bottom of the hay, and, seated thereon, he attempted to cross the bridge. While he was in the act of so crossing, some portion of the westerly abutment of the structure towards which he was driving gave way, and fell, causing a hole in the highway at the edge of the bridge, into which the forward wheel of the wagon fell, and the plaintiff was thrown off, and sustained severe injuries, to recover damages for which this action is brought. The usual questions are raised on this appeal: Was the defendant's highway commissioner negligent in failing to repair the abutment? Did the plaintiff establish the absence of contributory negligence on his part? Were the damages awarded to the plaintiff by the verdict for an excessive amount?

We will consider, first, whether the evidence permitted a finding by the jury that the defendant's highway commissioner was negligent in omitting to repair the abutment, the fall of which caused the accident. That the abutment was in a dangerous condition at the time cannot be doubted; and, from facts hereinafter adverted to, it must have been unsafe for some considerable period before it fell. It was not necessary for the plaintiff to show actual notice to the commissioner of the unsafe condition of the abutment, if the circumstances were such that ignorance on his part was in itself negligence. Hover v. Barkhoof, 44 N. Y. 113. It was the duty of the defendant's highway commissioner to inspect the roads and bridges in the town, and to exercise vigilance in that regard. Mackey v. Town of Locke (Sup.) 8 N. Y. Supp. 210; Embler v. Town of Wallkill, 57 Hun, 384, 10 N. Y. Supp. 797; Id., 132 N. Y. 222–227, 30 N. E. 404. If the commissioner failed to exercise such vigilance, and hence to discover the unsafe condition of the abutment, which would have been apparent to him on a careful examination thereof, his ignorance of its condition was in itself negligence, within the meaning of Hover v. Barkhoof, supra.

It was shown on the trial that Mr. Hardenbergh, commissioner

of highways of the defendant, received some notice of the unsafe condition of the bridge shortly before the accident, and that he and Mr. Ronk, a former highway commissioner of the town, on the previous 19th day of March had examined it. Mr. Hardenbergh testified that the abutment in question was then seemingly in good condition. Mr. Ronk also testified that, in his judgment, the abutment was then safe enough, although subsequently, in answer to the question, "When you left, did you consider it safe?" he said, "Yes, sir; safe enough to stand until it fell down." Had there been no other evidence tending to show negligence on the part of the highway commissioner, except the testimony of the present and former commissioner of highways, as above stated, that, on complaint of the condition of the bridge, they, shortly before the accident, went and examined it, and the abutment that afterwards fell appeared safe, it would have been difficult to sustain the finding of the jury. But Mr. Hardenbergh, after his attention was called to the bridge, was bound, not only to inspect the abutment, but to make a careful examination thereof. I think the evidence was such as to allow a finding by the jury that he failed to make a proper examination,—failed to exercise active vigilance. Mr. Ronk, in regard to the examination of the abutment made on the 19th of March preceding the accident, testified as follows:

"At this time we did not examine the abutment very closely. We stood off four or five feet, took off some plank, and looked at it. I did not give it much attention. He thought it would go. He thought it was safe, and would go all right. It stood up all right at that time."

Mr. Hardenbergh, after stating on his examination that he and Ronk reached the conclusion that the abutment was safe by simply passing within a few feet of it, and that that was all the examination ever made of the abutment, at that or any other time, testified as follows:

"I thought, at the time, that all that was necessary to do, in order to discover whether there are any defects in the abutments to a bridge, was to pass along two or three feet from it, and glance at it as I could; but I think different now. I had only been commissioner nine days. I think, now, they need a little closer inspection. Since this accident happened, I think that it probably would have been better to have made a closer inspection of that abutment. I don't know as I reached this conclusion from the examinations that I made of the abutment after it fell. I didn't see but a little bit of what had fallen."

It appears, therefore, that the abutment of the bridge on the 9th day of April, 1898, when plaintiff was injured, was unsafe; that Mr. Hardenbergh and Mr. Ronk examined the bridge on the preceding 19th of March. The testimony permitted the jury to find that they did not make a careful or thorough inspection, as Mr. Hardenbergh practically concedes in his testimony. But there was other evidence in the case, which, if credited, allowed the jury to find that there were apparent defects in the abutment which, on a diligent and careful examination, the highway commissioner would have detected. The witness Cruver examined the bridge a year before the trial (October 5, 1898), or within two years, and testified in regard to the abutment as follows:

"It looked to me as if one corner of the bridge, on the right hand side, was cobblestones, and as if it was very near falling down. It looked about as if it was to fall, and I was really afraid of it. The stones were not very large; looked to be like cobblestones,—not very good stones to build an abutment. * * * Yes, sir; it looked unsafe to me. I was led to this belief because some of the stones had fallen out in under the piece where those stringers went across the sill. Some of the stones had fallen out under the sill, and more of them looked as if they were just about ready to fall out the minute you went onto them, and I was very careful about going over it."

Mr. Ronk testified as follows in regard to the abutment:

"It was laid up dry; no very large stones; small stones, not very large. There were some pretty decent stones. It was a rough abutment on the side towards Ulsterville; no mason work. The stones were laid up loose, one upon another, to the top, and there were some sticks stuck in, also. I suppose they were put in to hold the stones together. Well, at that time I thought it looked kind of mean standing there in that shape, and a nice abutment put up on the other side,—nice mason work. It looked safe enough. I couldn't say nothing against it,—only that it was laid up with loose stones, and with sticks into it."

He inspected the abutment the morning of the accident, and said, in regard to it:

"I stood right on the bank, and looked right down at it. It was made up of not very large stone. The sticks that had been laid in at the time the abutment was put up were rotten where they went back in the ground. Q. Did that cause the abutment to give way? A. I think it had something to do with it. I wouldn't swear positive what made it go down. It might have been something else. The stones would naturally take the place of those rotted sticks. Having rotted away, something would have to settle, and that would cause the abutment to fall. I couldn't say that any stone had fallen out at the bottom of the abutment, because the dirt and stones had fallen and covered it over. Q. And did things indicate there that the abutment had been in that condition for some time? A. Well— Q. It looked that way? A. I can't tell you about that, how long it had been that way. It might have been that way for a number of years. It looked as though it had. It showed it."

The witness Evans stated, in regard to the abutment:

"It looked as if it had been put up with unhammered stone; just laid up, as we would lay up a stone wall, and on the same principle about as a stone wall, and about the same sort of stone usually used there."

The witness Little said:

"The abutment was built of what I should call common field stone. It had the appearance of a stone wall a good deal; built on the same principle as a stone wall,—a dry wall. I didn't call it a good job at first, and still an old job; that is, it wasn't built of proper material; that is, what I am in the habit of seeing put in abutments of bridges."

On the testimony above referred to, the jury were authorized to find, not only that the abutment was unsafe at the time of the accident, and must have been in that condition for a considerable period before the injury to the plaintiff, but that its defective condition was apparent, and that, had the highway commissioner made a careful examination of the structure, he could not have failed to discover that the abutment was unsafe.

The learned counsel for the appellant calls our attention to the case of Urquhart v. City of Ogdensburg, 91 N. Y. 67, and kindred authorities. These authorities might be applicable, had the accident occurred within a short period after the bridge had been built.

But the structure had been made many years before. There was evidence showing that it was built like an ordinary stone wall, with sticks laid in it to keep the wall in place, and that the sticks had become rotten. It was probably safe when first erected, and for a reasonable time thereafter; but it was likely to become unsafe after the lapse of many years, and especially if the sticks used to strengthen it had become rotten, and hence there was a duty on the part of the commissioner to give it a careful inspection. We reach the conclusion, therefore, that the question as to the negligence of the defendant's highway commissioner was properly submitted to the jury, and that the evidence in that regard is sufficient to sustain the verdict. It is probable that the counsel for the appellant, on the trial, was of the opinion that the testimony bearing on the negligence of the commissioner was sufficient to submit to the jury, as, on his motion for a nonsuit, he raised no question in that regard.

It is claimed on behalf of the defendant that the plaintiff himself was negligent in driving his load of hay on the bridge, when the testimony shows that he was aware of its unsafe condition. The defendant's witness Martin testified to an admission of the plaintiff tending to show his knowledge of the condition of the abutment the fall prior to the accident. The witness Robert Marks said that in the spring of 1897 the plaintiff requested him to tell the highway commissioner of the town that the bridge was unsafe. Mr. Dickinson, the supervisor of the defendant, stated a conversation with the plaintiff, in January or February before the accident, in which the latter complained of the condition of the abutment, and was afraid it would fall down in the spring, and asked Mr. Dickinson to see the highway commissioner about it. Assuming that such testimony was credited by the jury, it did not necessarily show negligence on the part of the plaintiff. Having given notice of the condition of the bridge, the plaintiff, at the time of the accident, could rely upon the fact that the town authorities had performed their duty in regard to the structure, without negligence being attributed to him. That duty is stated in Hover v. Barkhoof, supra, as follows:

"Defective bridges are dangerous, and travelers generally have no means of knowing whether they are safe or not. They have to rely upon the fidelity and vigilance of the highway commissioners, who are the only persons whose duty it is to see that the bridges are in repair. The burden imposed upon these officers by this rule is not too great. All it requires of them is that they shall, with reasonable care and fidelity, discharge the duties which they have solemnly sworn to perform."

The supervisor testified that the plaintiff made his complaint in January or February, 1898. Assuming, then, that the plaintiff thought the structure unsafe, it was allowed to remain open for public travel by the town authorities. Can we determine that the plaintiff was negligent in assuming that the officers of the town had performed their duty, and made a proper inspection of the structure, and in relying upon their judgment that it was safe?

In Taylor v. Town of Constable, 57 Hun, 371–374, 10 N. Y. Supp. 607, the case of an accident occurring in consequence of a de-

fective bridge, where it was shown that the plaintiff had more knowledge of its condition than the plaintiff in this case is shown to have had, Learned, J., in his opinion said:

"The argument of the defendant is that, if the defendant was negligent in not repairing, then the plaintiff had the same knowledge with the commissioner, and was, therefore, negligent in crossing. But we think the argument is not sound. The responsibility is with the commissioner. He must exercise his judgment, and see that the bridge is safe; and, when he leaves the bridge open for public travel, he practically asserts to the public that the bridge is safe. The traveler has a right to rely on this opinion of the officer intrusted with such an important duty."

On a second appeal of that case (61 Hun, 622), the opinion being published in 15 N. Y. Supp. 796, the doctrine so stated was reaffirmed, and this decision was affirmed on the opinion of the general term by the court of appeals. 131 N. Y. 597, 30 N. E. 63.

But, in his testimony on the trial, the plaintiff controverted the testimony of the witnesses above mentioned. He admits that he spoke of the defective condition of the bridge from time to time, but claims that he did not tell the supervisor that it was liable to fall. He did not think so. He testified as follows:

"I did not think it was a defective bridge, because I supposed the overseer of the highway had made it right. He had been at work there. Prior to the accident I supposed the bridge was in a defective condition, and wanted looking after by somebody. Our roadmaster had worked on the bridge, and repaired it. He fixed the plank. The commissioner had been there, and made an examination, and didn't shut it up; and I supposed it was all right."

Again, he said:

"I never supposed it was dangerous."

We must assume that the jury believed the testimony of the plaintiff in regard to his knowledge of the condition of the abutment, and the evidence is not so preponderating in that regard in favor of the defendant as to authorize us to set aside the verdict.

As the jury must have found that the plaintiff was not aware of the dangerous condition of the abutment when he drove upon the bridge, under the testimony we cannot determine that he was negligent in remaining on the seat of the wagon, instead of walking beside the oxen. All that the defendant's witnesses proved in that regard was that one driving in a dangerous place should walk by the side of the oxen. Unless the plaintiff was cognizant of the danger, he could not be deemed negligent in not doing so.

Nor does the fact that the plaintiff, when near the center of the bridge, on discovering that something was giving way, did not alight from the wagon, prevent a recovery. He was suddenly placed in a position of peril, and, although he made a mistake, may recover. The doctrine applicable to such a situation is stated in Dyer v. Railway Co., 71 N. Y. 228–235, as follows:

"The danger being imminent, the law does not demand that accuracy of judgment which would be required under other circumstances; and the authorities hold that, in such cases, an error of this description is not fatal to a recovery, and does not relieve the defendant from liability. Twombley v. Railroad Co., 69 N. Y. 158; Coulter v. Express Co., 56 N. Y. 585; Buel v. Railroad Co., 31 N. Y. 314."

We conclude that the finding of the jury as to the absence of contributory negligence on the part of the plaintiff was sustained by the evidence.

The amount of the recovery was large, but, on a careful review of the testimony, we are unable to say that it was excessive. The plaintiff is a young man, with a wife and child, and, previous to the accident, was strong and in good health. Three physicians were sworn on the trial as to the extent of his injuries, and their testimony was not contradicted. Dr. Merritt, among other things, testified to an injury to the plaintiff's hip joint and kidneys. He said:

"The man cannot walk without limping, and hurting him, and without the use of crutches. * * * My judgment as to the permanency of the condition of the hip is that it may be resisted, but it cannot be cured. It may, in future time, be broken down, and go on, and inflammation set up again, and anchylose that joint. That would be the natural result, without treatment; not inevitably, not always, but it follows with reasonable certainty. * * ° * His general condition is not good now. He is broken down. He is an injured man; injured for life; permanently injured. *. * * The injury to the kidney may be resisted, but it is generally progressive. Chronic inflammation follows, yet it may be resisted for a number of years. As the man passes middle life, and grows old, these things, if any of them are resisted, are apt to come back."

Dr. Beakes testified to the same state of facts, and to the permanency of the injuries received by the plaintiff,—that he would be permanently lame. He also testified to an injury to the rectum, and said:

"He will never get over that. His general health is poor. He is generally broken down."

The testimony of these two witnesses is fully corroborated by Dr. Neal. The latter testified as to the injury to the plaintiff's kidneys. He said:

"It is already diseased, and I think it will be permanent. The eventual result will be that he will lose the action of the kidney. He will die. With the destruction of the kidney,—a diseased kidney on the other side,—he will die. It also has the effect of impairing his health to a very large extent."

With such testimony in the case, uncontradicted, we cannot determine that the verdict was for an excessive amount.

One of the grounds stated by the defendant on the motion for a nonsuit was that the plaintiff had not shown the possession of funds by the commissioner of highways of the town to repair the bridge before the accident. But the want of funds by the highway commissioner with which to repair the bridge was a matter of defense, to be established by the defendant. Whitlock v. Town of Brighton, 2 App. Div. 21, 37 N. Y. Supp. 333; Quinn v. Town of Sempronius, 33 App. Div. 70–75, 53 N. Y. Supp. 325; McMahon v. Town of Salem, 25 App. Div. 1, 49 N. Y. Supp. 310.

We have examined the several exceptions taken by counsel for the appellant to the exclusion of testimony offered by the defendant on the trial, and are of the opinion that neither of such exceptions requires a reversal of the judgment.

Without deeming it necessary to discuss other positions taken by the learned counsel for the appellant, we reach the conclusion

that although the jury, on the testimony introduced by the parties, might well have reached a different conclusion from that arrived at, nevertheless it is not a case where we should be justified in setting aside the verdict as unsupported by the evidence, and hence that the judgment and order should be affirmed, with costs. All concur.