THE PEOPLE OF THE STATE OF NEW YORK ex rel. THE MULHOLLAND COMPANY, Relator, *v.* WILLIAM E. NOWAK, THOMAS E. WOODS, ALFRED METZ, GEORGE LINK and JOHN G. BENNETT, Constituting the Common Council of the City of Dunkirk, New York, Respondents.

(Supreme Court, Chautauqua Trial Term, February, 1917.)

Mandamus — alternative writ of — city of Dunkirk — pleading — contracts — judgments.

The issues presented by an alternative writ of mandamus requiring the common council of the city of Dunkirk to audit and pay the bill of relator for the sale of a motor-chemical fire apparatus and the answer of respondents, considered, and judgment awarded directing that the bill be audited and paid from any moneys legally applicable thereto and in the absence of such funds that the amount of such claim be included in the next tax levy.

While a want of funds might have constituted a defense if pleaded and proven, it was a sufficient answer, to a contention that the purchase of said apparatus was unauthorized and the contract therefor invalid because the budget made no provision for relator's claim, that no such defense was interposed by respondents' answer.

APPLICATION for a writ of mandamus.

Rebadow, Ladd & Brown (Thomas J. Cummings, of counsel), for relator.

Lyman A. Kilburn, City Attorney, for respondents.

COLE, J.    An alternative writ of mandamus was granted requiring the common council of the city of Dunkirk to audit and pay the bill of the relator amounting to $6,700 for the sale of a motor-chemical-fire apparatus. The respondents, the common council of the city of Dunkirk, served an answer. By stipulation the present councillors are substituted as parties defendant. The issues presented by the writ and answer were tried before the court, a jury being waived. The following facts appear:

The common council of the city of Dunkirk consists of five members, one of whom is elected from the city at large and is known as " councilman at large." He is the presiding officer of the common council " and in the absence of the mayor of the city " he shall " become acting mayor with the same powers and duties possessed by the mayor."

By section 160 of the city charter of Dunkirk it is provided also: " The board of police and fire commissioners of the city of Dunkirk shall consist of the commissioners so elected and the mayor of the city, who shall by virtue of his office be the presiding officer of the board."

The elected commissioners are two, thus making the board consist of three members.

During the year 1914 the said board consisted of John T. Sullivan, mayor, and John Dean and William H. Brophy.

The proceedings of the board of police and fire commissioners show that in May, 1914, the board decided to advertise for bids upon specifications prepared, filed and published for a motor-chemical-fire apparatus, all the members including the mayor voting affirmatively upon the resolution. Bids were accordingly advertised for and the relator was the

lowest bidder at $6,500, and on August 31, 1914, at a meeting of the board the following resolution was passed:

"*Resolved,* that the motor-fire-apparatus and pumper be purchased from the Mulholland Company at its bid of $6,500.00, said company to furnish standard connections, including a " Y," self-starter, electric lights and to furnish a guarantee satisfactory to the Board of Police and Fire Commissioners before the contract of such apparatus is executed."

This resolution was carried, Dean and Brophy voting aye and the mayor voting no.

On September 14, 1914, the following resolution was unanimously passed at a meeting of this board:

"*Resolved,* that the clerk be directed to notify the Mulholland Company of the action of the commissioners with regard to the purchase of the motor-fire-apparatus and pumper, and that a further provision be embraced in the contract specifications to the effect that the pump must stand the State Underwriters' test of eight hundred gallons (800) per minute before acceptance by the commissioner."

On November 3, 1914, representatives of the relator appeared before the board and advised them that the apparatus and pumper had arrived, and the *mayor informed them* that a contract embodying the provisions stipulated by the board " at the time the board voted to accept the Mulholland Company's offer " would have to be submitted and signed before final action would be taken.

On December 7, 1914, at a meeting of the board the relator submitted a contract and the same was referred to the city attorney. At the same meeting it was moved and carried, Dean and Brophy voting aye and Mayor Sullivan voting no,

8

" That the minutes of the meeting of the Board of Police and Fire Commissioners of August 31, 1914, in so far as they relate to the resolution of Commissioner Dean authorizing the acceptance of the bid of the Mulholland Company for the purchase of motor-fire-apparatus and pumper be amended and passed as follows:

" By Commissioner Dean: ' Resolved that the motor-fire-apparatus and pumper be purchased from the Mulholland Company of this city at its bid of $6,500, said company to furnish standard connections, including ' Y,' self-starter, electric lights and to furnish guarantee satisfactory to the Board of Police and Fire Commissioners before the contract for such apparatus is executed, the cost of the self-starter to be $200 in addition to said bid ' and that the minutes of said meeting as so amended be and the same are approved."

No further meeting was held until the special meeting hereinafter stated.

As will be seen from the foregoing the mayor, who originally had been in favor of the purchase of a motor-chemical-fire apparatus, for some reason was opposed to awarding the contract to the Mulholland Company, although it was the lowest bidder. The term of office of Commissioners Dean and Brophy was about to expire December thirty-first, and they were known to be favorable to the proposition of awarding the contract and accepting the apparatus from the relator.

On December twenty-fourth Dean and Brophy called on the mayor at his office and asked for a special meeting to finish up the purchase of the motor-fire-apparatus and it was then and there unanimously agreed that a meeting would be held on December

twenty-eighth at eight o'clock P. M.   I find this, notwithstanding a conflict in the testimony.

On December twenty-eighth in the afternoon Dean and Brophy each received from the mayor a letter advising them that he had been '' unexpectedly called out of town on very important personal business, which demands my immediate attention,'' and that '' the board will not convene this evening.''   As a matter of fact the mayor went to Buffalo, which is fifty miles distant and between which two cities trains run every few hours, and he remained away until January first when the terms of office of Dean and Brophy expired.   He purposely absented himself in order to prevent the holding of a meeting which he had agreed upon with the other members of the board, and at which he knew the relator's purchase would be closed up if the meeting were held.

No rules for calling special meetings of the board existed, but they were accustomed to arrange for their meeting sometimes by mutual agreement, sometimes by oral notice and sometimes by written notice and sometimes by getting together and holding the meeting.   This meeting was arranged and agreed upon in the usual way.

Dean and Brophy met at the agreed time notwithstanding the mayor's attempt to call off the meeting. At this meeting Dean was chosen to act as chairman and Brophy to act as clerk.   The city attorney's report on the contract executed by the relator was presented and ordered filed.   The city attorney reported that the contract presented contained all the provisions required, with the exception of the provision called for by the resolution of November second (meaning the one of September fourteenth) '' that the pump must stand the State Underwriters' test of 800 gallons

**116** People ex rel. Mulholland Co. *v.* Nowak.

Supreme Court, February, 1917.          [Vol. 99.

per minute. * * * There is a provision, however, that said pump shall be capable of pumping 800 gallons per minute. Whether the absence of this provision in the contract is a matter of any importance is for your board to determine. With the exception above noted I approve of the above contract and believe that it contains all the provisions set forth in the specifications, and the further provisions required by the board in the various resolutions with reference to this matter."

The meeting was thereupon adjourned to December twenty-ninth at eight o'clock P. M., and the acting clerk was required " to notify the Mayor and City Clerk of the adjournment." They were unable to notify the mayor of the adjournment. The adjourned meeting was held at the appointed time, December twenty-ninth, at eight P. M., Dean and Brophy attending. The Mulholland contract executed in duplicate was by resolution approved, and it was further resolved: " That this board is satisfied with the guarantee contained in said contract that the pumping capacity of said apparatus is up to specifications, and that the Underwriters' test, if there be any such test, is hereby waived."

The contract was signed by the two commissioners. The bill of the Mulholland Company for $6,700 was approved and certified to the common council for payment, who thereafter refused to order it paid, whereupon this proceeding was instituted. The contract between the relator and the city would have been complete when the bid was accepted by the resolution passed August thirty-first, were it not for the fact that such resolution accepting the bid required a self-starter and a guarantee before the contract was to be executed. The provision relative to self-starter was

in fact complied with and the contract in that respect became an executed one by tendering a machine so equipped. By resolution of a subsequent date the sum of $200 was to be paid for this additional equipment and the minutes of the meeting of August thirty-first at which the Mulholland bid was accepted were accordingly amended. The machine was tendered containing the additional equipment, and a contract signed by the Mulholland Company. This machine as presented with the contract signed by the relator taken in connection with the preceding resolutions, in my opinion, constituted a complete contract, which when executed on the part of the relator entitled it to its pay, unless it be that the written contract failed to embrace a provision to the effect '' that the pump must stand the State Underwriters' test of 800 gallons per minute.'' It should be noted that this resolution of September fourteenth did not require a *certificate* of the State Underwriters' Association, but simply that the *contract* to be signed by the relator should contain a *provision* that '' the pump must stand the State Underwriters' test of 800 gallons per minute.''

The contract presented contains no provision that the pump will stand the '' State Underwriters' test,'' but does contain a provision guaranteeing that '' the pump shall be capable of pumping 800 gallons per minute.'' There was no proof that the State Underwriters' Association apply any test to fire apparatus or that it is a matter over which they have anything to do.

I am of the opinion: *First.* That inasmuch as no one at the trial seemed to know anything about any State Underwriters' test or that there is any such test the contract as presented contained a sufficient compliance with the requirement of the board, and that without

any further meeting of the board the relator presented a case of a completed contract executed on its part and entitling it to have its bill certified to the common council and by them to be ordered paid.

*Second.* If it was necessary to have a meeting in order to pass upon or to waive this particular requirement that the contract should contain a provision that , " the pump must stand the State Underwriters' test " then this meeting was a valid meeting.

The meeting is presumed to be regular. *Rome* v. *Whitestown Water Works Co.,* 113 App. Div. 547; *People ex rel. Locke* v. *City of Rochester,* 5 Lans. 11; 20 Am. & Ency. of Law, 1213.

The charter contains no provision relative to special meetings or the method of calling, and there is no ordinance on the subject, the board having been accustomed to hold special meetings and to arrange for them by mutual agreement, or upon oral notice. The agreement on December twenty-fourth to hold the meeting on December twenty-eighth and the mayor's statement at the time that a special meeting would be held at a stated time for a special purpose constituted a sufficient notice of the meeting.

In *Matter of Extension of Church Street,* 49 Barb. 455–458, it appeared that the commissioners held meetings by arrangement and by oral notification which were held to be valid.

It is contended by the defendants that in the absence of the mayor the councilman-at-large was acting mayor, and should have been notified. The meeting was regularly called by the mayor when he agreed thereto on December twenty-fourth, and the other commissioners were not required to give further notice of the meeting, either to the mayor or to the acting mayor, although had he seen fit to appear he

would have been entitled to participate in the meeting *provided the mayor were actually and in good faith absent and unable to attend.*

Furthermore the act of the mayor in purposely absenting himself from the city, within reaching distance of which he was all the time, in order to prevent the meeting, did not in my opinion constitute such " absence from the city " as gave the acting mayor any authority to act. *Mayor of Detroit* v. *Moran,* 46 Mich. 213.

It is further claimed that this purchase was unauthorized and the contract invalid for the reason that the budget adopted in April, 1914, made no provision for this item. This proof was received over the relator's objection.

It is sufficient answer to this contention that no such defense was interposed by the answer. *People ex rel. Schank* v. *Green,* 64 N. Y. 499.

Want of funds is a defense to be alleged and proved. *Bullock* v. *Town of Durham,* 64 Hun, 380; *Boyce* v. *Town of Shawangunk,* 40 App Div. 593; *Adsit* v. *Brady,* 4 Hill, 630; *Hines* v. *City of Lockport,* 50 N. Y. 236.

While a *want of funds* might have constituted a defense if pleaded and proven (*People ex rel. Dannat* v. *Comptroller,* 77 N. Y. 45–50; *People ex rel. Downing* v. *Stout,* 23 Barb. 338), yet no such defense is in fact asserted. There is no pretense that the city is without such funds available to pay this claim, or without the means or authority to obtain the funds, but simply that this item was not provided for in the budget.

In many if not most of the city charters, provisions are found for an appropriation of funds to the several departments, and in many that no indebtedness shall be contracted in any year for any department in excess of the estimate in the budget, and that the funds of one

department shall not be applied to the uses of another department. In charters containing such provisions it is clear that mandamus will not lie, where there has been no appropriation of funds applicable to the payment of the particular claim, or where an indebtedness is incurred in excess of the estimates. Such are *Kip* v. *City of Buffalo,* 123 N. Y. 55; *Swift* v. *City of New York,* 83 id. 528; *Beckwith* v. *City of New York,* 121 App. Div. 462.

In the absence of such provision the contracting of an indebtedness in excess of the estimates contained in the budget is not unauthorized, nor is it a defense in mandamus proceedings, provided there are funds available or which can be obtained for the payment of the claim. *People ex rel. Childs* v. *Cartwright,* 9 Hun, 159; *Mutual Gaslight* v. *Mayor,* 49 How. Pr. 227.

The charter of the city of Dunkirk provides for estimates from the heads of the various departments, and for the adoption of a budget therefrom (§ 170), and that when the budget shall have been completed " the amount shall be levied as the tax for the ensuing year " (§ 170) and the common council is authorized to levy " such sum as may be necessary *for the purposes herein specified, and in accordance with such estimates,* not to exceed the sum of $60,000 in any one year." § 170. The italics are mine.

And by section 173 the common council is prohibited from incurring any liability " beyond this title." The charter contains no provision appropriating to any particular department the amount of funds called for by the estimates for that particular department, nor does it prohibit incurring an indebtedness in excess of the estimate for any particular department, nor does it prohibit the use of funds incurred in the estimate of one department from being used for another depart-

ment. It appears to be all city funds. It limits the amount that can be levied to $60,000 and prohibits incurring liability " beyond this title."

I think in view of the other provisions that the words " beyond this title " must mean beyond the amount limited by this title, to wit, $60,000.

The fact that there is no money in the particular fund from which it can be paid will not avail if there is any fund from which it can be paid. *People ex rel. Dannant* v. *Comptroller,* 77 N. Y. 45.

I do not think the failure to include this item in the estimate constitutes a defense.

Findings may be prepared in accordance with the foregoing suggestions, and judgment awarded directing the common council to audit the relator's bill at $6,700, with interest from December 29, 1914, and to pay the same with the costs of this action from any moneys applicable to the payment thereof, and if there are no such funds legally applicable to the payment of said claim, then that such amount be included in the next tax levy. Costs are awarded to the relator.

Ordered accordingly.